**Marc P. Berger**
**Sanjay Wadhwa**
**Adam Grace**
**Richard G. Primoff**
**Yitzchok Klug**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**200 Vesey Street, Suite 400**
**New York, New York 10281-1022**
**(212) 336-0148 (Primoff)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x

**SECURITIES AND EXCHANGE COMMISSION,**            :
                                                   :
                                **Plaintiff,**      :
                                                   :          **19 Civ. 9013 (JSR)**
                          **– against –**           :
                                                   :          **ECF CASE**
**ALKIVIADES DAVID and**                            :
**HOLOGRAM USA NETWORKS INC.,**                     :          **AMENDED COMPLAINT**
                                                   :          **AND JURY DEMAND**
                                                   :
                                **Defendants.**     :
------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission ("Commission"), for its Amended

Complaint against defendants Alkiviades David ("David") and Hologram USA Networks Inc.

("Hologram") (collectively, "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.     From late November 2017 until late March 2018, Hologram, which purported to

stage holographic shows featuring the likenesses of famous deceased performers at its

nationwide network of theaters, and David, its founder, Chairman and CEO, engaged in a

fraudulent scheme to induce the investing public to buy securities of Hologram and its subsidiary

in unlawfully unregistered offerings, through materially false and misleading representations

1

about Hologram's business.

2.      On November 30, 2017, David sought approval from the Commission's Division of Corporation Finance ("Corp. Fin.") for a public offering of Hologram's stock under the Commission's Regulation A [17 C.F.R. §§ 230.251-230.263] ("Regulation A")  through a "Form 1-A" offering statement (the "Circular") he signed and filed.  But at least a week before that filing, David had already launched, through general solicitations, an unregistered offering of stock in Hologram's subsidiary, and then, from mid-December 2017, an unregistered offering of convertible notes issued by Hologram.

3.      Through a nationwide television commercial and internet campaign that hyped Hologram's purportedly imminent public offering, Defendants knowingly or recklessly disseminated materially false and misleading statements to promote these unregistered offerings to prospective investors. They falsely touted, for example, that Hologram held exclusive rights to stage holographic shows featuring famous living or deceased performers like Whitney Houston, Tupac Shakur, the Jackson 5, Buddy Holly and Roy Orbison.  They also falsely claimed that Hologram had established a "current theater network" consisting of eight identified theaters around the United States.

4.      Through this fraudulent conduct, Defendants succeeded by the end of March 2018 in obtaining more than $100,000 from investors, many if not most of whom were not accredited, from the sale of securities of Hologram and its subsidiary, in violation of registration requirements.

5.      Defendants, meanwhile, sought to conceal these unlawful sales from Corp. Fin., which had learned of the unregistered offerings, and asked for an explanation.  First, Defendants falsely assured Corp. Fin. in early February 2018 that their offerings were restricted to accredited

investors, and that they had made no sales.  Then, in March 2018 they falsely assured Corp. Fin.

that Defendants had terminated their offerings in February 2018. In fact, Defendants only

stopped selling Hologram's securities in late March 2018, and only after they learned that Corp.

Fin knew their prior assurances were false, and that the Commission's Division of Enforcement

had begun an inquiry.  Defendants then began informing Hologram's investors that they "would

be refunding everyone who is not an accredited investor."

## VIOLATIONS

6.      By virtue of the conduct alleged herein, each of the Defendants, directly or

indirectly, singly or in concert, violated Sections 5(a) and (c) of the Securities Act of 1933

("Securities Act") [15 U.S.C. §§ 77e(a) and (c)], Section 17(a) of the Securities Act [15 U.S.C.

§§ 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15

U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  In addition, David aided

and abetted Hologram's violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]

and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17

C.F.R. § 240.10b-5].

7.      The Commission seeks final judgments permanently enjoining Defendants from

violating the federal securities laws, requiring each Defendant to disgorge their ill-gotten gains

and to pay prejudgment interest on those amounts; requiring Defendants to pay civil monetary

penalties; barring Defendant David from serving as an officer or director of publicly traded

companies; and seeking any other relief that the Court deems just and appropriate.

8.      Unless Defendants are permanently restrained and enjoined, they each will again

engage in the acts, practices, and courses of business set forth in this Complaint, or in acts and

transactions of similar type and object.

## JURISDICTION AND VENUE

9.     The Commission brings this action pursuant to the authority conferred by Sections 20(b) and (d) of the Securities Act [15 U.S.C. §§ 77t(b) and (d)], and Sections 21(d) and (e) of the Exchange Act [15 U.S.C. §§ 78u(d) and (e)].

10.     This Court has jurisdiction over this action pursuant to Sections 22(a) and (c) of the Securities Act [15 U.S.C. §§ 77v(a) and 77v(c)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa.  Defendants, directly or indirectly, singly or in concert, have made use of the means or instrumentalities of transportation or communication in, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

11.     Venue lies in this district pursuant to Sections 22(a) and (c) of the Securities Act [15 U.S.C. §§ 77v(a) and (c)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Southern District of New York.  Among other things, Defendants disseminated their false and misleading statements in this District, and solicited investments from individuals residing in this District.

## DEFENDANTS

12.     **Hologram** is a Delaware corporation with its headquarters in Beverly Hills, California.  Hologram was incorporated on November 6, 2017, and filed and publicly disseminated the Circular on November 30, 2017 with the Commission's "EDGAR" database. According to the Circular, Hologram had ten full-time employees during the relevant period and occasionally hired part-time employees to assist with specific projects.

13.     **David** resides in Beverly Hills, California.  David is the founder of Hologram and at all relevant times was its Chairman and CEO.  At all times relevant herein, David, directly

and/or indirectly, owned more than 90% of Hologram's stock.

**FACTS**

A.      **Hologram's Unregistered Offerings and Sales of Securities**

      1.      **Defendants' Filing For A Public Offering Under Regulation A**

14.      Regulation A provides a limited exemption from the Securities Act's Section 5 registration requirements, for offerings of securities of up to $50 million in a twelve-month period.  However, a company must, among other things, first file with the Commission an offering statement, or circular, providing certain basic disclosures about the company.

15.      Although Regulation A permits issuers to "test the waters" with the general public with solicitation materials before Corp. Fin., under delegated authority from the Commission, has qualified the issuer's offering, issuers are not permitted to begin selling such securities unless and until the offering materials have been so qualified.

16.      On November 30, 2017, David signed and filed the Circular on Hologram's behalf, through which they sought qualification of a public offering under Regulation A. In the Circular, David and Hologram claimed that Hologram was an experienced holographic production company that, among other things, held "exclusive rights to commercially exploit holographic images and performances of an array of famous entertainers."  In addition, they claimed, one of its core growth strategies was to establish other hologram theaters around the nation.  Hologram stated in the Circular that its offering share price was to be $8.00, and that it planned to apply for listing on NASDAQ under the trading symbol "HOLO" after the offering was qualified by the Commission.

17.      David and Hologram also alerted prospective investors in the Circular that any information they considered "material to an evaluation of our company … may also be

5

disseminated using our investor relations website, which can be found at
http://www.HologramUSA.com, and press releases."

### 2. David's Launch of the Unregistered Offerings With a General Solicitation

18. David did not wait for approval from the Commission of the Circular before offering or selling securities to investors. At least a week before he filed the Circular, David, instead, initiated and oversaw a general solicitation to investors of securities in Hologram and a subsidiary, in two offerings for which no registration statement was in effect. David and Hologram used for this purpose a television commercial campaign that began airing no later than November 23, that proclaimed among other things, "anyone can invest – minimum $400," and urged the public to "invest now," "before the banks scoop up all the stock." Defendants also used their "investor relations" website at hologramusa.com to solicit investors.

19. Hologram's television commercial directed prospective investors to visit Hologram's website (where the commercial and other promotional videos could also be viewed), and/or to telephone a call center staffed with employees of Hologram. Hologram's website prominently displayed a reference to Hologram's purportedly upcoming public offering, with a NASDAQ "countdown clock," a link to the Circular, and an "invest now" button that provided electronic links for investors to submit payment information.

20. Hologram's website also presented a slide deck that viewers could view or download, and which Defendants used to promote and solicit investments in Hologram's securities. The slide deck was entitled "Initial Public Offering," and it purported to provide information about Hologram's business, as well as summary terms of Defendants' Regulation A public offering. Defendants used the slide deck to promote and solicit investments in Hologram's securities during the entire period of the unregistered offerings, from late November

2017 through March 26, 2018, and during this period prospective investors could view and/or download the deck from the website.  Defendants' call center representatives also routinely emailed the slide deck to prospective investors.

21.    Initially, from approximately November 26, 2017 until on or about December 11, 2017, Defendants offered shares of common stock in a Hologram subsidiary, Hologram USA Entertainment Inc. ("Hologram Entertainment") to investors, and entered into subscription agreements for the sale of same.  After on or about December 11, 2017, and continuing until at least March 26, 2018, Hologram instead offered and sold to investors "Convertible Bridge Promissory Notes" of Hologram (the "Notes").

22.    The Notes bore an interest rate of 10% per annum, and were convertible to shares of stock either upon the election of the investor, or automatically, upon the "initial closing of [Hologram's] pending initial public offering," at a conversion rate of one share of stock for each $8 of principal on the Notes.

23.    No registration statement was in effect for either of these offerings at any time.

     **3.    David's Oversight of and Participation in the Unregistered Offerings**

24.    David initiated and oversaw these unregistered offerings.  He hired and decided upon the compensation for the staff that communicated with investors, and directed the script they were to use in communicating with prospective investors.  David signed each of the subscription agreements for common stock as the CEO of Hologram Entertainment, and he signed each of the Notes, as Hologram's "President and Founder."

25.    Throughout these unregistered offerings, David monitored through email communications investor reaction and interest in Defendants' offerings, and he knew at all relevant times that Hologram had made the slide deck and other solicitation materials available

for viewing and downloading on and from Hologram's website, as well as a link to the Circular. Moreover, David approved the slide deck and other solicitation materials, and directed their dissemination by Hologram in the manner described. Through at least one such email communication dated November 23, 2017, David knew or recklessly disregarded that prospective investors were in fact viewing the television commercial and downloading the slide deck.

26.     Defendants offered and sold securities in Hologram Entertainment and Hologram in these unregistered offerings to all investors, whether accredited or not accredited as defined under Rule 501of the Commission's Regulation D.  From late November 2017 through March 26, 2018, Defendants received a total of at least $100,000, approximately, from sales of these securities, to approximately 100 or more investors, many if not most of whom were not accredited.

### 4.     Defendants' Attempts to Conceal Their Sales From Corp. Fin.

27.     Defendants did not disclose these unregistered offerings to the Commission in the Circular that David signed and filed on November 30, 2017, and in fact, even while they sought to entice investors in the unregistered offerings with the prospect of a Regulation A public offering, they simultaneously attempted continuously during this period to deceive and conceal their unlawful sales from the Commission.

28.     By letter dated December 27, 2017 addressed to David, Corp. Fin., commenting on the Circular, noted, among other things, that Hologram's website "appears to include information related to [the Regulation A offering] as well as other offerings," and referenced a "convertible shares agreement, a link to the offering circular for this offering statement, a reference to NASDAQ with a countdown clock, an invest now button and a TV commercial

related to a stock offering."

29.     In this same letter, Corp. Fin. requested that David, to the extent Defendants were conducting multiple offerings, describe the "nature of each such offering," and "to the extent any of the materials on your website are testing the waters materials for [the Regulation A offering], please identify them to us and file them as an exhibit to the offering statement."

30.     By letter dated February 5, 2018 (on which David was copied), Defendants did not dispute any of Corp. Fin.'s factual observations about the materials and links available on Hologram's website, and responded that Hologram had sought to conduct "only one interim financing transaction through the use of its corporate website," which was their offering of the Notes.  Defendants told Corp. Fin. in their letter that this offering was "intended to be conducted in accordance with the provisions of Rule 506(c) of Regulation D."

31.     Further, Defendants falsely represented in their February 5, 2018 letter that "[o]nly accredited investors were offered the notes" and "[n]o sales in the interim financing were made."  Hologram and David, who signed the Notes issued to investors, and the subscription agreements with investors purchasing Hologram Entertainment stock, knew or recklessly disregarded that these representations were false: By the date of their February 5, 2018 letter, in fact, Defendants had already received more than $50,000 from sales of these securities, including from investors who were not accredited.

32.     Defendants also confirmed in this letter that the slide deck that had been available on Hologram's website constituted the "testing the waters" materials to which the Commission staff had referred in its December 27, 2017 letter.  David, on behalf of Hologram, filed the deck with the Commission as Exhibit 13.1 to an amended offering circular that David signed on behalf of Hologram, and Defendants filed, on February 6, 2018 (the "Amended Circular").

33.    After their deceptive February 5, 2018 letter to Corp. Fin., Defendants continued their general solicitation for their unregistered offering of the Notes.  From February 5 through the end of March 2018, Defendants sold more than $53,000 from sales of the Notes, including approximately $28,000 Defendants received from just one individual, a non-accredited investor residing in New York County ("Investor A"), on or about February 20 and 26, 2018.

34.    At no time during February or March 2018 did Defendants ever correct their prior false representations to Corp. Fin. that their unregistered offerings were available only to accredited investors, or that no sales had been made.  On the contrary, Defendants continued to seek to conceal their unlawful sales of the Notes from Commission staff, while still seeking approval from it for its Regulation A offering.

35.    On February 21, 2018, for example, Corp. Fin. again wrote to David, on behalf of Hologram, and referenced Defendants' prior representation from February 5 that "no sales were made in the interim financing round that was conducted through your website."  Corp. Fin. requested that "to the extent such offering is complete," Defendants "remove the TV commercial and other offering materials related to the interim financing round from your website."

36.    Defendants responded by letter dated March 13, 2018 (on which David was copied), in which they not only failed to correct the prior misrepresentation in their February 5 letter, but also omitted to tell Corp. Fin. they were continuing to offer and sell the Notes to investors.

37.    In this same letter, Defendants also misleadingly told Commission staff that upon receipt of Corp. Fin.'s February 21, 2018 letter, Hologram had "promptly removed the TV commercial and other offering materials related to the interim financing round from its website." As Defendants knew or recklessly disregarded, however (but omitted to disclose to the

Commission), they were still making these offering materials, and payment instructions, available to investors on another website to which they were now directing investors: hologramusa.net.

38.     Defendants did not cease their sales of the Notes until late March 26, 2018, and even then did so only after Corp. Fin. again wrote to David, by letter dated March 23, 2018, and alerted Defendants that it was aware that Defendants, contrary to their prior representations, were continuing to make their offering materials, and payment instructions, available to investors on hologramusa.net.

39.     The March 23, 2018 letter also advised Defendants that their video was still publicly available on that website and elsewhere on the internet, and that Defendants' "invest now" link was still active, and allowed prospective investors to submit electronic payment information.  Corp. Fin. again requested these materials be removed, and that the payment links be disabled.  By reply letter dated March 26, 2018, Defendants, without disputing any of its assertions, assured Corp. Fin. staff it had done so.

40.      By then, the Commission's Division of Enforcement had also sent requests for information to Defendants regarding the manner in which Defendants had conducted their unregistered offering of the Notes, as well as certain representations made in the offering materials.  Shortly thereafter, Defendants began advising the investors to whom they had sold the Notes that they were undertaking to refund all non-accredited investors.

41.     As of the end of April 2018, Defendants claimed to have refunded all but approximately $26,000 of the funds they had received from their sales of the Notes.

11

B.       **Defendants' Fraudulent Scheme to Sell Hologram Securities to Investors**

42.       As discussed above (see ¶¶ 3, 18-20, *supra*), Defendants sought to lure investors to purchase stock in Hologram Entertainment, and Hologram's Notes, during the period of their unregistered offerings by hyping the purportedly imminent public offering of Hologram stock under Regulation A, and by seeking to connect in the minds of prospective investors their unregistered offerings with their Regulation A offering.  In effect, by engaging in this unlawful general solicitation in this manner, Defendants were seeking to obtain for themselves the benefit of a Regulation A public offering, without complying with its provisions or obtaining the required qualification – while simultaneously and fraudulently seeking to conceal what they were doing from the Commission staff reviewing the Regulation A Circular.

43.       Defendants also carried out their fraudulent scheme by making and disseminating to prospective investors across the United States material misrepresentations, and omitting material facts necessary to make their representations not misleading.

44.       Beginning no later than on or about November 23, 2017, Defendants made their slide deck (*see* ¶ 20, *supra*) continuously available for viewing and downloading by the public on its website, and began emailing it to prospective investors who telephoned the call center. They also included it as Exhibit 13.1 to the Amended Circular. To further underscore with investors a false connection between their unlawfully unregistered offering with their as-yet unqualified Regulation A offering, Defendants titled their slide deck "Initial Public Offering," and the deck contained a summary of the purported terms of its Regulation A offering.

45.       Although the content of the slide deck varied at different times during the period of their unregistered offerings, Defendants used words and photographic images in the slide deck, and videos and images on its television commercial and website, continuously throughout

their unregistered offerings to misrepresent to prospective investors that Hologram held the

exclusive right to stage holographic shows of certain famous deceased performers.  They also

used the deck to materially overstate the extent and reach of Hologram's purported "network" of

theaters.

>    1.    **Defendants' False Representations**
>          **Regarding Their Rights to Images and Performances**

46.    From late November through December 2017, Defendants disseminated on

Hologram's website and emailed to prospective investors a slide deck bearing a "November

2017" date.  Defendants, for example, emailed that version of Hologram's slide deck to a non-

accredited investor residing in Indianapolis, Indiana ("Investor B") on December 24, 2017, who

viewed the slide deck and then paid $400 for the Notes on or about one day later.  Defendants

continued to disseminate this slide deck (with different dates) in this same fashion from January

through March 2018 as well.  One such investor, a resident of Aurora, Colorado ("Investor C")

who also was not an accredited investor, viewed the slide deck on Hologram's website and paid

$400 for the Notes on or about February 15, 2018.

47.    In the slide deck's "Executive Summary" and elsewhere in the deck, Defendants

claimed that Hologram was "the holder of exclusive rights to holographic images and

performances of an array of iconic talent."  This claim was consistent with Defendants' claim in

the Circular that one of Hologram's competitive advantages was the "exclusive relationships with

key talent and content providers … [that] can be used in our holographic productions."

48.    Defendants identified Whitney Houston, the Jackson 5 and Buddy Holly in their

slide deck as among their primary examples of "iconic talent" for which Hologram held

exclusive rights for holographic shows, and Defendants also featured Whitney Houston, with a

prominent photograph, on a page identifying her in their "current show lineup." They also

included photographs of Buddy Holly and Whitney Houston in a photographic collage with other deceased performers labelled "Hologram USA Productions," conveying to prospective investors that Buddy Holly and Whitney Houston, together with the other performers included in that collage, were examples of performers for whom Defendants held exclusive rights to stage holographic shows.

49.     The slide deck, through December 2017, also identified Roy Orbison with text and photographs, as part of their "live" concert series, and although some versions of the slide deck employed thereafter in January and March 2018 omitted his name, they consistently and prominently included one or more of his photographs (showing Roy Orbison with his guitar), in the slide deck's photographic collage of deceased performers, conveying to prospective investors that he was also an example of the performers for whom Defendants held exclusive rights to stage holographic shows.

50.     Defendants also included photographs of the deceased performers Bob Marley, Liberace, Nat King Cole and Patsy Cline in the slide deck's photographic collage, conveying to prospective investors that they were examples of performers for whom Defendants held exclusive rights to stage holographic shows.

51.     Throughout all versions of the slide deck that the Defendants disseminated on their website and emails, Defendants also prominently identified the deceased performer Tupac Shakur as one of the talents featured in Defendants' "resurrection attractions."

52.     Hologram's television commercial that was aired beginning in November 2017 also prominently featured the name "Tupac," with holographic images of him singing and dancing. Hologram also disseminated on its website a video entitled "HOLOGRAM USA – MOBILE STAGE home of the Tupac Hologram" that featured an apparent holographic

performance of Tupac Shakur.

53.     In addition, on a page of their slide deck entitled "Some of Our Biggest Hits," Defendants included "Tupak [sic] Shakur: Coachella."  This was a reference to a well-known holographic performance featuring Tupac Shakur from that music festival in 2012.

54.     In the Amended Circular David signed and filed on behalf of Hologram on February 6, 2018 (*see* ¶ 32, *supra*), Defendants also claimed that Hologram had installed the "Tupac Shakur Coachella Palm Springs Music festival," and had done so within "24 hours."

55.     Defendants' representations regarding Hologram's experience in staging these Tupac Shakur shows, and their purportedly exclusive rights to continue to stage and present holographic performances or shows of him, Whitney Houston, the Jackson 5, Buddy Holly, Roy Orbison, Bob Marley and Patsy Cline were material, and Defendants disseminated them, successfully, to induce the investing public to purchase Hologram's stock and the Notes.  As Defendants knew or recklessly disregarded, however, these representations were materially false and misleading, and omitted to state material facts necessary to make them not misleading.

### a.     Whitney Houston

56.     Although Hologram Entertainment had previously entered into an agreement in 2015 with the entity representing Whitney Houston's estate, Whit Nip Media, LLC ("Whit Nip") for the use of Whitney Houston's name and likeness for holographic performances, Defendants knew or recklessly disregarded that, contrary to their representations to the investing public, that license granted Hologram Entertainment only non-exclusive rights, which made Defendants' representations regarding their "exclusive" rights to Whitney Houston materially false and misleading.

57.     Furthermore, Defendants knew, or recklessly disregarded, that on or about

December 9, 2016, Whit Nip notified counsel for Hologram in writing that it was terminating the non-exclusive license, claiming that Hologram Entertainment had materially breached the agreement by reason of its inability to perform and produce a hologram show during the time required in the contract.

58.     David was made aware of this termination no later than December 12, 2016, through correspondence from Hologram's counsel – approximately eleven months before Defendants began disseminating their false claims regarding Whitney Houston to the investing public.

59.      As David also knew or recklessly disregarded, Hologram Entertainment sued Whit Nip on or about July 10, 2017 in California state court, seeking a declaratory judgment that the agreement was still in effect.  Hologram Entertainment explicitly alleged in its complaint that the agreement with Whit Nip was non-exclusive, contrary to the claims they would shortly be making in the slide deck they disseminated to the investing public.

60.     David knew at all times and by no later than November 7, 2017, through correspondence from Hologram counsel on which he was copied, that this litigation was still pending at the time he and Hologram were disseminating their false claims about their purportedly exclusive right to stage shows of Whitney Houston during Defendants' unregistered offerings.  Judgment in favor of Whit Nip was ultimately entered in that matter on July 24, 2018

61.     At no time did Defendants disclose in the slide decks they were disseminating to the investing public or anywhere else that the agreement with Whit Nip had never granted Hologram Entertainment exclusive rights regarding Whitney Houston.  Nor did they disclose in their slide decks either Whit Nip's termination of the non-exclusive license, or the pendency of litigation over that termination.  These omitted facts were material, and were necessary to make

their representations not misleading.

62.     In its December 27, 2017 letter to David and Hologram, Corp. Fin. staff advised

Defendants that it was aware of the litigation regarding the agreement with Whit Nip, and

requested that Hologram amend the Circular to disclose that fact.

63.     Defendants waited more than a month to comply with this request, during which

time Defendants continued to disseminate their false and misleading claims regarding their rights

to Whitney Houston, and Defendants continued to sell the Notes to investors.

64.     On February 6, 2018, David signed and filed the Amended Circular electronically

with the Commission, and thereby publicly disseminating it.  Although Defendants now

mentioned in the Amended Circular for the first time the litigation with Whit Nip, they continued

to conceal from the public that the agreement with Whit Nip at issue in the litigation had,

contrary to their misrepresentations, granted Hologram Entertainment only a non-exclusive

license.

65.     In response to Corp. Fin.'s December 27, 2017 letter requesting that Defendants

file the solicitation materials that they had been making available on their website before then as

"testing the waters" materials, David also filed with the Amended Circular he signed, as its

Exhibit 13.1, a version of the slide deck Defendants had been disseminating to prospective

investors by email and on the website, and which they were continuing to do so.

66.     Although Defendants removed a photograph of Whitney Houston and several

references to her in Exhibit 13.1, that deck continued to misleadingly identify her in several

places in the slide deck as one of their "iconic talents" as to whom they had "exclusive" rights.

67.     Moreover, Defendants, knowingly or recklessly, continued to disseminate on their

website the version of their slide deck that featured a prominent photograph of Whitney Houston

and additional references to her, while continuing to omit the material information that their agreement with Whit Nip had been terminated, was the subject of litigation and, contrary to their representations, never granted them "exclusive" rights.

> **b.**     **The Jackson 5**

68.     Defendants, beginning in November 2016, engaged in discussions to obtain a licensing agreement necessary to stage holographic shows of the Jackson 5, with the entity that held the rights to the Jackson 5's trademark and sound recordings.  By approximately August 2017, however, as Defendants knew or recklessly disregarded, those discussions had terminated unsuccessfully, and Defendants had not obtained the necessary agreement. David was a participant in these negotiations and was regularly included in correspondence regarding them, including correspondence from Defendants' counsel in August 2017 that made it clear no such agreement had been reached.

69.     Defendants also knew or recklessly disregarded that they never obtained the necessary rights to the images or likenesses of members of the Jackson 5, including from the estate of Michael Jackson, which was also necessary to stage holographic shows of the Jackson 5.

70.     Defendants' repeated claims that they were "the holder of exclusive rights to holographic images and performances" of the Jackson 5, as they knew or recklessly disregarded, were materially false and misleading.

> **c.**     **Roy Orbison**

71.     Although Hologram Entertainment had entered into an agreement in 2015 with the entity representing Roy Orbison's estate, Roy's Boys LLC ("Roy's Boys") for the right to stage holographic performances of Roy Orbison, on October 11, 2016 (more than a year before

Defendants' unregistered offerings), Roy's Boys had notified Hologram Entertainment that it was terminating its agreement, based on Hologram's breach of the agreement.

72.   After that termination, and months before Defendants began their unregistered offerings, Roy's Boys began working with a competitor of Hologram. David knew or recklessly disregarded the foregoing circumstances, as he had engaged in direct conversations complaining of the foregoing with his competitor's chief executive officer in early November 2017, and threatened litigation over it.

73.   In addition, Hologram's counsel, by telephone on November 7, 2017, threatened Roy's Boys with litigation over the termination of the agreement, to which Roy's Boys responded, first, by letter dated November 8, 2017 in which it insisted that Defendants' continued use of Roy Orbison's name and likeness, including on Hologram's website, was an infringement of Roy's Boys' rights and deceptive to the public, and demanded that Defendants remove Roy Orbison from Hologram's website.

74.   Then, on November 20, 2017, Roy's Boys sued Hologram Entertainment in New York State Supreme Court, seeking a judgment that its termination of the agreement was proper, and noting in its complaint David's threats of litigation in mid-November 2017 to Hologram's competitor over its dealings with Roy's Boys.  This litigation, like the litigation involving Whit Nip, was pending during the entire period of Defendants' unregistered offering.

75.   Defendants knowingly or recklessly omitted the foregoing material facts from their slide decks, omissions that made their claims regarding Hologram's rights to Roy Orbison materially misleading.

76.   Defendants, in fact, chose to continue to conceal from prospective investors the foregoing material facts about the termination of the agreement with Roy' Boys, even after Corp.

Fin., in its December 27, 2017 letter, requested that Defendants "confirm that you have disclosed all material legal proceedings affecting the company."

77.     Defendants falsely represented to the Commission staff in their February 5, 2018 letter in response (on which David was copied), that other than the Whit Nip litigation that had been brought up by Corp. Fin., Hologram "does not believe that there are any other material legal proceedings pertaining to its use of images or creative work of living or late performers."

78.      Despite knowing that the Commission staff deemed the litigation with Whit Nip to be material, Defendants did not disclose the existence of the litigation with Roy's Boys in the Amended Circular, or in the slide deck that David filed with the Amended Circular as Exhibit 13.1.

79.     On the contrary, Defendants, knowingly or recklessly, continued to falsely and misleadingly identify Roy Orbison by name and photographs as one of the deceased performers whom they had the right to present in holographic shows.  Although various versions of the slide deck they subsequently disseminated on Hologram's website removed Roy Orbison's name, his photograph continued to appear in the deck, continuing to create the materially false and misleading impression that Defendants possessed the right and ability to stage holographic shows of him.

### d.     Buddy Holly

80.     Although Hologram Entertainment had entered into an agreement in 2014 with Buddy Holly's widow and Buddy Holly Licensing, LLC (the "Buddy Holly Estate Reps.") for the right to commercially exploit the image and likeness of Buddy Holly for holographic performances, the Buddy Holly Estate Reps. and the successor to their interests had repeatedly complained in writing of Defendants' failure to perform, beginning as early as November 2016.

By letter dated May 3, 2017, their representative provided written notice to David and Hologram of the termination of the agreement, and threatened to proceed to arbitration for confirmation of the termination and for damages for Defendants' breach.  Their representative repeated that position in correspondence to Defendants' counsel in August 2017.

81.     In correspondence from Hologram's counsel dated November 7, 2017 on which David was copied (*see* ¶ 60, *supra*), Hologram's counsel confirmed that the Buddy Holly Estate Reps. had notified Defendants of its position that the agreement was terminated because of Hologram's failure to perform.

82.     Defendants knowingly or recklessly omitted the foregoing material facts from their slide decks, omissions that made their claims regarding Hologram's rights to stage holographic images and performances of Buddy Holly materially misleading.

### e.     Tupac Shakur

83.     As Defendants also knew or recklessly disregarded, Defendants' claims (1) in the Amended Circular that they had installed the well-known 2012 Tupac Shakur holographic performance at Coachella, and had done so "in 24 hours," and (2) in their slide deck that this performance was one of Hologram's "biggest hits," were materially false and misleading: Neither David nor Hologram had anything to do with that show.  In fact, the only connection Defendants had to that 2012 performance was that two years later, Defendants purportedly acquired patents to certain technologies that were used to project that hologram.

84.     As Defendants also knew or recklessly disregarded, their representations in their slide decks that they had the present right to stage "resurrection" shows featuring Tupac Shakur were also materially false and misleading.  As Defendants knew or recklessly disregarded, at no time had they ever entered into any agreement with representatives of Tupac Shakur's estate, or

anyone else with appropriate authority, to obtain the right to present holographic images or performances of him.

85.     These omissions were material, and made Defendants' representations regarding Tupac Shakur materially false and misleading.  Defendants made these false representations, and omitted the foregoing material information, knowingly or at a minimum recklessly, as part of their fraudulent scheme to obtain investor funds in their unregistered offerings, through their dissemination to the investing public of the slide decks, as well as the Circular and Amended Circular.

### f.     Bob Marley, Patsy Cline, Liberace and Nat King Cole

86.     As Defendants knew or recklessly disregarded, neither Defendants nor Hologram Entertainment have ever held any license to commercially exploit the image or likeness of Bob Marley in order to stage holographic performances.

87.     Indeed, as Defendants knew or recklessly disregarded, more than a year before Defendants launched their unregistered offerings of Hologram securities, representatives of the estate of Bob Marley complained in writing to Defendants' counsel, beginning on or around July 2016, that they were falsely including references and images of Bob Marley in promotional materials for David's affiliated company, FOTV, in connection with an upcoming public offering of its securities. They also demanded that Defendants remove all such claims and images relating to Bob Marley.  Defendants, through their counsel, did not dispute these assertions, and communicated their compliance with these demands in or about September 2016.

88.     Although Hologram Entertainment had entered into an agreement in 2014 with representatives of the estate of Patsy Cline, that agreement had expired by its terms no later than April 2017, and as Defendants knew or recklessly disregarded, representatives of the estate of

Patsy Cline had provided repeated written notice to them of that termination, and demands that Defendants remove all images of Patsy Cline from their website, in advance of Defendants' unregistered offerings, all of which demands Defendants refused.  In correspondence from Hologram's counsel dated November 7, 2017 on which David was copied (*see* ¶ 60, *supra*), Hologram's counsel confirmed that the estate of Patsy Cline had asserted that the agreement was ineffective as a result of Hologram's failure to perform.

89.     Although Hologram Entertainment entered into an agreement with the Liberace Foundation for the Performing and Creative Arts in 2014 that granted Defendants' rights relating to a holographic performance of Liberace, that agreement, as Defendants knew or recklessly disregarded, expired by its terms in February 2017, without Defendants or Hologram Entertainment ever having performed under the agreement.

90.      Although Hologram Entertainment entered in an agreement with representatives of the estate of Nat King Cole in 2014, as Defendants knew or recklessly disregarded, that agreement had terminated in or about May 2017 by mutual agreement of the parties.

91.     In view of the foregoing, Defendants' claims concerning their rights to present holographic images and performances of Bob Marley, Patsy Cline, Liberace and Nat King Cole were, as they knew or recklessly disregarded, materially false and misleading.

### 2.     Defendants' Misrepresentations Regarding Hologram's "Current Theater Network"

92.      In Defendants' Circular and Amended Circular, as well as another amended circular that David also signed and filed electronically with the Commission, and thus publicly disseminated on behalf of Hologram on March 26, 2018, Defendants claimed that one of their "core growth and expansion strategies is to establish hologram theaters by partnering with existing theater owners by integrating our patented technology, exclusive shows and holographic

experiences in prominent locations throughout the United States and Canada."  In these same documents, Defendants stated that expanding their network of theaters, would require six months of work, at a cost of $200,000 to $400,000 per theater.

93.     In the slide decks that Defendants disseminated to prospective investors during their unregistered offerings, Defendants included a page entitled "Current Theater Network," which listed eight identified theaters across the United States, thus conveying to prospective investors that they had accomplished their expansion, and spent the time and money required, to present shows at each of these eight theaters.

94.     Among the theaters Defendants included on this list were the Landmark Theater in Indianapolis, Indiana, the Civic Theater in New Orleans, Louisiana, the Saratoga Casino in Saratoga Springs, New York, and the Twin River Casino in Rhode Island.

95.     As Defendants knew or recklessly disregarded, Defendants' representations that these four theaters were part of Hologram's "current theater network" were materially false and misleading.  At no time had Defendants ever entered into any agreements – or, as they phrased it in the Circular, "partnerships" – with these four theaters, much less, as Defendants each knew or recklessly disregarded, had they spent the time and money that Defendants acknowledged in the Circular were necessary to prepare the theaters to present Hologram's shows.

### FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against Both Defendants)

96.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 95 of this Complaint.

97.     By engaging in the acts and conduct described in this Complaint, Defendants, with scienter, directly or indirectly, singly or in concert, by use of the means or instruments of

transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities of Hologram: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

98.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, violated, are violating, and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**
**Violations of Section 17(a)(1) and (3) of the Securities Act**
**(Against Both Defendants)**

99.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 95 of this Complaint.

100.     By engaging in the acts and conduct described in this Complaint, Defendants, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, in the offer or sale of securities of Hologram, have: (a) with scienter, employed devices, schemes, and artifices to defraud; or (b) knowingly, recklessly or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities of Hologram.

101.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, violated, are violating, and, unless restrained and enjoined, will continue to violate Sections 17(a)(1)-(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1)-(3)].

## THIRD CLAIM FOR RELIEF
### Violations of Section 17(a)(2) of the Securities Act
### (Against Hologram)

102.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 95 of this Complaint.

103.     By engaging in the acts and conduct described in this Complaint, Defendant

Hologram knowingly, recklessly or negligently, directly or indirectly, singly or in concert, by use

of the means or instruments of transportation or communication in interstate commerce, in the

offer or sale of securities of Hologram, has obtained money or property by means of any untrue

statements of a material fact or omitted to state a material fact necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading.

104.     By reason of the foregoing, Hologram, directly or indirectly, singly or in concert,

violated, is violating, and, unless restrained and enjoined, will continue to violate Section

17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Violations of Section
### 10(b) of the Exchange Act and Rules 10b-5(a), (b) and (c)
### (Against David)

105.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 95 of this Complaint.

106.     By engaging in the acts and conduct described in this Complaint, Defendant

David directly or indirectly, singly or in concert, provided knowing and substantial assistance to

Defendant Hologram and others, which, directly or indirectly, singly or in concert with others, in

connection with the purchase or sale of a security, with scienter, used the means or

instrumentalities of interstate commerce or of the mails or of a facility of a national securities

exchange to (a) employ devices, schemes, or artifices to defraud; (b) make untrue statements of

material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and (b) engage in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon others.

107.    By reason of the foregoing,  Defendant David aided and abetted, and, unless restrained and enjoined, will continue aiding and abetting, Hologram's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rules 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b) and (c)], in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

### FIFTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Sections 17(a)(1), (a)(2) and(a)(3) of the Securities Act**
**(Against David)**

108.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 95 of this Complaint.

109.    By engaging in the acts and conduct described in this Complaint, Defendant David directly or indirectly, singly or in concert, provided knowing and substantial assistance to Hologram and others, which, directly or indirectly, singly or in concert with others, in the offer or sale of a security, used the means or instruments of transportation or communication in interstate commerce or used the mails to (a) with scienter employed devices schemes, and artifices to defraud; (b) knowingly, recklessly or negligently obtain money or property by means of any untrue statements of a material fact or omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) knowingly, recklessly or negligently engage in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of

securities of Hologram.

110.    By reason of the foregoing, Defendant David aided and abetted, and, unless restrained and enjoined, will continue aiding and abetting Hologram's, and others' violations of Sections 17(a)(1), 17(a)(2) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), (a)(2) and (a)(3)], in violation of Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)].

### SIXTH CLAIM FOR RELIEF
**Unregistered Offering or Sale of Securities in Violation of Sections 5(a) and (c) of the Securities Act**
**(Against Both Defendants)**

111.    The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 95 of this Complaint.

112.    By engaging in the acts and conduct described in this Complaint, Defendants, directly or indirectly, singly or in concert, made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer or sell securities through the use or medium of a prospectus or otherwise, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.  The shares of Hologram Entertainment and Notes of Hologram that Defendants offered and sold as alleged herein constitute "securities" as defined in the Securities Act and the Exchange Act.

113.    By reason of the foregoing, Defendants have violated, and, unless restrained and enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief, in a Final Judgment:

### I.

Finding that Defendants violated the federal securities laws and rules promulgated thereunder as alleged against them herein;

### II.

Permanently restraining and enjoining Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)];

### III.

Permanently restraining and enjoining Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

### IV.

Permanently restraining and enjoining Defendants, their respective agents, servants, employees and attorneys and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

## V.

Permanently barring David from acting as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## VI.

Ordering Defendants to disgorge all of the ill-gotten gains from the violations alleged in this complaint, and ordering them to pay prejudgment interest thereon;

## VII.

Ordering Defendants to pay civil money penalties pursuant to Section 20(d)(2) of the Securities Act [15 U.S.C. § 77t(d)(2)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; and

## VIII.

Granting such other and further relief as this Court deems just and proper.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands trial by jury as to all issues so triable.

Dated: December 2, 2019
New York, New York

By: _____

Marc P. Berger
Sanjay Wadhwa
Adam Grace
Richard G. Primoff
Yitzchok Klug
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0148 (Primoff)
Email: primoffr@sec.gov

30